**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 19-3693
_____

CARE ONE MANAGEMENT, LLC, ET AL.,
Appellants

v.

UNITED HEALTHCARE WORKERS EAST, ET AL.

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 2:12-cv-06371)
District Judge: Honorable Susan D. Wigenton
_____

Argued: September 24, 2020
_____

Before: McKEE, JORDAN, and RENDELL, *Circuit Judges*.

(Opinion filed: December 17, 2021)

Rosemary Alito **[Argued]**
George P. Barbatsuly
K&L Gates
One Newark Center
10th Floor
Newark, NJ 07102

Donald Burke
Roy T. Englert, Jr.
Robbins Russell Englert Orseck Untereiner & Sauber
2000 K Street, N.W.
4th Floor
Washington, DC 20006
  *Counsel for Plaintiff-Appellants*

A. Matthew Boxer
Lowenstein Sandler
One Lowenstein Drive
Roseland, NJ 07068

Leon Dayan **[Argued]**
Jacob Karabell
Caitlin D. Kekacs
Joshua A. Segal
Bredhoff & Kaiser
805 15th Street, N.W.
Suite 1000
Washington, DC 20005

David M. Slutsky
Levy Ratner
80 Eighth Avenue
8th Floor
New York, NY 10011

R. Scott Thompson
Wollmuth Maher & Deutsch
500 Fifth Avenue
12th Floor
New York, NY 10110
  *Counsel for Defendants-Appellees*

_____

OPINION

_____

McKee, *Circuit Judge.*

Plaintiff-Appellants Care One Management, LLC; HealthBridge Management, LLC ("HealthBridge"); the Care

One Facilities;[1] and the HealthBridge Facilities[2] (collectively, "Care One") manage nursing homes and assisted-living

[1] Care One manages 21 facilities located throughout the State of New Jersey including the following: Care One at Birchwood, LLC, d/b/a Care One at The Highlands; Care One at East Brunswick, LLC, d/b/a Care One at East Brunswick; Care One at Hamilton, LLC, d/b/a Care One at Hamilton; Care One at Madison Avenue, LLC, d/b/a Care One at Madison Avenue; Care One at Mercer, LLC, d/b/a Care One at Ewing; Care One at Parsippany-Troy Hills, LLC, d/b/a Care One at Morris; Care One at Teaneck, LLC, d/b/a Care One at Teaneck; Care One at Wall, LLC, d/b/a Care One at Wall; Care Two, LLC, d/b/a Care One at Livingston; Care One at Moorestown, LLC, d/b/a Care One at Moorestown; Elmwood Evesham Associates, LLC, d/b/a Care One at Evesham; HCC, LLC, d/b/a Care One at Holmdel; King James Care Center of Middletown, LLC, d/b/a Care One at King James; Millennium Healthcare Centers II, LLC, d/b/a Care One at Dunroven; Millennium Healthcare Centers II, LLC, d/b/a Care One at Valley; Millennium Healthcare Centers, LLC, d/b/a Care One at Pine Rest; Millennium Healthcare Centers, LLC, d/b/a Care One at The Cupola; 11 History Lane Operating Company, LLC, d/b/a Care One at Jackson; 101 Whippany Road Operating Company, LLC d/b/a Care One at Hanover Township; 301 Union Street, LLC, d/b/a Care One at Wellington; and 493 Black Oak Ridge Road, LLC, d/b/a Care One at Wayne; the Rehabilitation Center at Raritan Bay Medical Center, LLC d/b/a Care One at Raritan Bay Medical Center; Care One at Trinitas, LLC, d/b/a LTACH – CareOne at Trinitas Regional Medical Center; and Care One at Harmony Village, LLC, d/b/a CareOne Harmony Village at Moorestown (collectively referred to herein as the "Care One Facilities"). *Care One Mgmt., LLC v. United Healthcare Workers E.*, No. 12-6371, 2019 WL 5541410, at *1 n.1 (D.N.J. Oct. 28, 2019).
[2] The HealthBridge Facilities include the following: 600 Kinderkamack Road Operating Company, LLC, d/b/a Oradell Health Care Center; 800 River Road Operating Company, LLC, d/b/a Woodcrest Health Care Center; 2 Cooper Plaza Operating Company, LLC, d/b/a South Jersey Health Care Center; 1621 Route 22 West Operating Company, LLC, d/b/a

4

facilities throughout the Northeast. Defendant-Appellees are 1199SEIU United Healthcare Workers East ("UHWE"), New

Somerset Valley Rehabilitation and Nursing Center; 341 Jordan Lane Operating Company II, LLC, d/b/a Wethersfield Health Care Center; 1 Burr Road Operating Company II, LLC, d/b/a Westport Health Care Center; 107 Osborne Street Operating Company II, LLC, d/b/a Danbury Health Care Center; 240 Church Street Operating Company II, LLC, d/b/a Newington Health Care Center; 245 Orange Avenue Operating Company II, LLC, d/b/a West River Health Care Center; 710 Long Ridge Road Operating Company II, LLC, d/b/a Stamford Health Care Center; 162 South Britain Road Operating Company II, LLC, d/b/a River Glen Health Care Center; 2028 Bridgeport Avenue Operating Company II, LLC, d/b/a Golden Hill Health Care Center; 745 Highland Avenue Operating Company, LLC, d/b/a The Highlands Health Care Center; 135 Benton Drive Operating Company, LLC, d/b/a Redstone Health Care Center; 178 Lowell Street Operating Company, LLC, d/b/a Lexington Health Care Center; 19 Varnum Street Operating Company, LLC, d/b/a Lowell Health Care Center; 199 Andover Street Operating Company, LLC, d/b/a Peabody Glen Health Care Center; 2101 Washington Street Operating Company, LLC, d/b/a Newton Healthcare Center; 221 Fitzgerald Drive Operating Company, LLC, d/b/a New Bedford Health Care Center; 260 Easthampton Road Operating Company, LLC, d/b/a Holyoke Rehabilitation Center; 312 Millbury Avenue Operating Company, LLC, d/b/a Millbury Health Care Center; 49 Thomas Patten Drive Operating Company, LLC, d/b/a Cedar Hill Health Care Center; 548 Elm Street Operating Company, LLC, d/b/a Calvin Coolidge Nursing and Rehab. Center for Northhampton; 57 Old Road to Nine Acre Corner Operating Company, LLC, d/b/a Concord Health Care Center; 64 Performance Drive Operating Company, LLC, d/b/a Weymouth Health Care Center; 750 Woburn Street Operating Company, LLC, d/b/a Wilmington Health Care Center; Park, Marion and Vernon Streets Operating Company, LLC, d/b/a Brookline Health Care Center; 265 Essex Street Operating Company, LLC, d/b/a Essex Park Rehabilitation Center; and DES Senior Care Holdings LLC, d/b/a Sweet Brook Care Centers (collectively referred to herein as the "HealthBridge Facilities"). *Id.* at n.2.

England Health Care Employees Union, District 1199 ("NEHCEU"), and two labor unions affiliated with Service Employees International Unions ("SEIU") (collectively, "Unions").

The Unions represented several employees at various Care One facilities. Care One sued the Unions for damages arising from actions that Care One alleged amounted to a pattern of racketeering in violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act, based upon, *inter alia*, its characterization of these actions as "extortionate."[3]

The District Court granted the Unions' motion for summary judgment and dismissed the complaint. The Court held that no reasonable juror could conclude that the vandalism underlying Care One's claims could be attributed to union members, much less the Unions themselves.[4] It also concluded that other actions the Unions undertook to exert pressure on Care One—including advertisements, picketing, and attempts to invoke regulatory and legislative processes—were not "extortionate." The Court further concluded that Defendants lacked the specific intent to deceive and, therefore, were entitled to summary judgment on the mail and wire fraud claims.[5] This appeal followed.

Notwithstanding the protests of our dissenting colleague—expressing extreme distaste for the Unions' tactics—the caselaw compels us to conclude that the District Court correctly decided that labor tactics, such as the Unions engaged in here, are not extortionate and accurately reasoned the remaining issues before it. Thus, for the reasons we discuss below, we will affirm.[6]

---

[3] 18 U.S.C § 1961 *et seq*.

[4] *Care One*, 2019 WL 5541410, at *6.

[5] *Id.* at *7–10.

[6] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 28 U.S.C. § 1367. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review a grant of summary judgment *de novo*. *Tundo v. Cnty. of Passaic*, 923 F.3d 283, 286 (3d Cir. 2019). A district court properly grants summary judgment if the moving party shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* at 287 (citing

## I. Factual Background

This suit is the culmination of a history of conflict and animosity that has unfortunately characterized the relationship between Care One and the Unions. In 2010 and 2011, the Unions filed charges against Care One with the National Labor Relations Board.[7] The Unions alleged that Care One had improperly terminated or threatened employees, improperly discontinued benefits, and wrongfully suppressed union communications at the Connecticut Facilities.[8] They also alleged that Care One had engaged in unfair labor practices during and after a union election in the Somerset, New Jersey Facility.[9] The NLRB issued Complaints and Notices of Hearing charging Care One with interfering with rights guaranteed by the National Labor Relations Act, including refusal to bargain collectively and in good faith.[10]

Beginning in January 2011, while the NLRB complaints were pending, NEHCEU and Care One unsuccessfully attempted to negotiate a renewal of the Connecticut Facilities' collective bargaining agreements.[11] Thereafter, in June 2012, NEHCEU called a strike at those facilities to begin on July 3, 2012.[12] On the night before the strike was to begin, the Connecticut Facilities were vandalized and sabotaged.[13] Patient identifying information (including patient wrist bands, door name plates, and dietary requirement documents) were mixed up.[14] Medical records were altered, medical equipment was damaged or hidden, and laundry equipment was vandalized.[15] At Care One's request, the Connecticut State's Attorney investigated, but the investigation yielded neither suspects nor charges.

---

Fed. R. Civ. P. 56(a)). We view the facts "in the light most favorable to the non-moving party and [draw] all reasonable inferences in that party's favor." *Id.* (citations omitted).

[7] *Care One*, 2019 WL 5541410, at *2.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*, at *3.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

Union documents later obtained in discovery revealed the Unions' plans to inspire workers to "become angry about their working conditions"[16] and to resort to "more militant" levels of activity.[17] The President of the NEHCEU also made a speech to workers in which he told them that "the law takes too long" and that NEHCEU "could be destroyed by the time the law was able to stop [Care One's] behavior."[18] After the incidents, NEHCEU's communications director wrote to fellow employees, referring to the allegations of vandalism and destruction. The communication sent out to union members included the statement: "Of course anyone with a pea-sized brain would realize this isn't a tactic we would undertake."[19] When a reporter asked the NEHCEU about the vandalism and destruction at the Care One facilities, NEHCEU's communications director wrote:

> The allegations made by HealthBridge, if true, are very serious indeed. Should evidence be found that anyone took any action that would compromise care or put residents at risk, that person or persons should be held fully accountable, no matter who they might be.[20]

The record also contains several emails from the time following the incident. They include an email from Deborah Chernoff, Communications Director of the New England Health Care Employees Union, District 1199, SEIU, which describes a response to a FOIA request the Unions made to the Department of Health as "mudd[ying] the waters and support[ing] the contentions of the workers that" patients may have removed their identifying bracelets themselves rather than saboteurs.[21] There is also an email from Chernoff to Chas Walker, Elected Organizer, and others in SEIU. It was sent after the vandalism and sabotage. The email appears to be a

---

[16] JA 5852, a facilitator teaching document with the goal of "answer[ing] tough questions and redirect[ing] conversations to an organizing agenda."
[17] JA 5849, a supervisor's evaluation form for an individual organizer.
[18] Defs.' Summ. J. Reply 5.
[19] JA 6825.
[20] JA 1068.
[21] JA 5842.

response to Walker's suggestion that Unions launch their own investigation or actively seek to participate in the police investigation. In the email, Chernoff suggested it would be "a very bad idea" to seek to participate in the police investigation because the Unions should not "suggest [they] have information [they] don't have."[22] The email also stressed the Unions' obligation to their members.

In addition, in 2011, with the assistance of NEHCEU and UHWE, SEIU launched a campaign attacking Care One's labor and business practices. The campaign materials included developing websites, print and radio advertisements, as well as flyers questioning Care One's billing practices and standards of care. The campaign also publicized the NLRB complaints.[23] The Union advertisements Care One focuses on before us included several rhetorical questions. The first asks: "Are HealthBridge Nursing Homes Employing Enough Caregivers For Our Loved Ones?" It asserts Care One provided below-average coverage by certified nursing assistants.[24] The second asks: "Is HealthBridge Giving Your Loved One Anti-Psychotic Drugs?" and asserts that Care One excessively administered medications.[25] The third asks: "Overbilled at a HealthBridge Nursing Home?," and references overbilling.[26] The fourth asks: "Who's in charge At HealthBridge Nursing Homes?" and states that the facilities have an unhealthy level of turnover.[27]

The Unions submitted evidence to the District Court to show that this publicity campaign was subject to fact-checking and vetting procedures. But Care One alleges no such safeguards were in place. Despite Care One's allegations to the contrary, Amy Gladstein, UHWE's Assistant for Strategic Organizing, testified that the Unions had adopted certain protocols requiring researchers to be trained in conducting careful research. She also claimed that the advertisements were based on initial fact-gathering. She said the work had to be "vetted by the research department for accuracy,"[28] and the

---

[22] JA 5831.
[23] *Care One*, 2019 WL 5541410, at *3.
[24] JA 2491.
[25] JA 2501.
[26] JA 2477.
[27] JA 2494.
[28] JA 2761.

advertisements were fact-checked by trusted researchers and outside counsel.[29]

From July through November 2011, the UHWE also filed petitions for public hearings on applications for "determinations of need," which Care One had filed with the Massachusetts Department of Health to obtain approval for capital improvement projects at their facilities.[30] The Unions' objections delayed approval of Care One's applications.

In February 2012, the Unions also asked Senator Richard Blumenthal, one of Connecticut's two United States Senators, to investigate Care One's alleged questionable billing practices. Senator Blumenthal responded by asking the Secretary of Health and Human Services to audit Care One's billing practices.

The Unions' campaign also included peaceful demonstrations, including one held in August 2012 at Care One's offices, where petitions for fair collective bargaining were delivered to Care One's owner and CEO, Daniel Straus. In addition, the Unions staged a peaceful protest at NYU Law School where demonstrators handed out materials questioning Straus's purported hypocrisy for endowing the Institute for the Advanced Study of Law & Justice at NYU while allegedly violating labor law.

## II.    Procedural Background

Care One brought this suit for damages based on claims of defamation, trade libel, and racketeering. The Complaint alleged that the Unions' conduct transcended the limits of organizing or legitimate advocacy and was more accurately defined as a pattern of racketeering activity under RICO.[31] Indeed, the animosity between Care One and the Unions as well as Care One's assessment of the Unions' "advocacy" is forcefully communicated at the outset of Appellants' Brief.

---

[29] *See* JA5327 (cite checking was "Megan [Thorsfeldt's] job and I trust her"); JA2642 (vetting was conducted on the research side and legal side); JA5134 (accuracy was the responsibility of "our research team" and "counsel"); JA 3718 (Gladstein explaining that "my researchers" were responsible for accuracy).

[30] JA 1480–84.

[31] *Care One,* 2019 WL 5541410, at *5.

10

There, Care One implies that the defendants are labor unions in name only.[32]

## III. Discussion

RICO imposes criminal and civil liability upon those who engage in certain "prohibited activities."[33] It allows for civil remedies for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]."[34] Under § 1962(c), to establish civil liability, a plaintiff must show that defendant(s) acted as an "enterprise" and conducted a "pattern of racketeering activity" through certain criminal predicate acts.[35] These predicate acts include federal crimes such as extortion, mail fraud, and wire fraud, and certain state crimes, including extortion.[36] For an act to be a predicate offense under state law, the conduct must be "generically classified as extortionate." [37] The generic definition of extortion is "obtaining something of value from another with his consent induced by the *wrongful* use of force, fear, or threats."[38]

Care One contends that the Unions extorted Care One through sabotage and vandalism and by applying economic pressure. It claims that the Unions thereby committed predicate acts of extortion in violation of Connecticut, New Jersey, and Massachusetts state law.[39] The District Court employed a generic definition of extortion and used the federal Hobbs Act definition of "wrongfulness" from *Brokerage*

---

[32] Appellants' Br. at 1 ("The defendants in this case are labor unions, at least in name . . . .").

[33] *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232 (1989).

[34] *Wilkie v. Robbins*, 551 U.S. 537, 563 (2007) (alterations in original) (citing 18 U.S.C. § 1964(c)).

[35] 18 U.S.C. § 1962(c).

[36] *Id.* § 1961(1)(A), (B). Here, it is not disputed that a labor union can constitute a RICO enterprise if its affairs are conducted through a pattern of racketeering activity. *See United States v. Parise*, 159 F.3d 790, 795 (3d Cir. 1998).

[37] *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003).

[38] *Id.* (emphasis added).

[39] *Care One Mgmt., LLC*, 2019 WL 5541410, at *5.

*Concepts, Inc. v. U.S. Healthcare, Inc.*[40]  Care One argues that the District Court erred in using a federal Hobbs Act definition of "wrongfulness" in concluding that the Unions were not guilty of extortion under state law.  The District Court did not err.

As we explained above, the generic definition of extortion is "obtaining something of value from another with his consent induced by the *wrongful* use of force, fear, or threats."[41]  The Hobbs Act definition of extortion has the same "wrongful use" element as generic extortion.[42]  Accordingly, the generic definition and the Hobbs Act definition are

---

[40] *Id.* at *5–7 (citing 140 F.3d 494 (3d Cir. 1998)).

[41] *Id.* at *5 (emphasis added) (quoting *Scheidler*, 537 U.S. at 409).  *See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 503 (3d Cir. 1998).

[42] The generic definition of extortion is "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats." *United States v. Nardello*, 393 U.S. 286, 290 (1969).  Whereas the Hobbs definition is "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). *See also United States v. Enmons*, 410 U.S. 396, 399–400 (1973) (interpreting the statutory language of the statute).

substantially the same.[43]  Hobbs Act cases are therefore relevant to our analysis of state law extortion claims.[44]

**1. Extortion**

Care One relies on two purported types of extortionate acts to establish the requisite RICO predicates.[45]  It alleges that the Unions resorted to fear of economic loss to obtain property through campaigns and petitioning and attempted to obtain property by force through a Union-authorized sabotage on the eve of the Connecticut strike.  We will address each claim in turn.

### a. Extortion Through Fear of Economic Loss

We conclude that the Unions' conduct—employing pressure campaigns, regulatory processes, and the criminal justice system—does not subject them to liability under the Hobbs Act.

---

[43] The Dissent's suggestion that it may be incorrect to treat these definitions the same is plainly at odds with the caselaw discussed above.  The Dissent offers no caselaw as support for this assertion, but simply suggests that the "linguistic parsing in *Enmons* is . . . not obviously applicable."  Dissent at 5.  Confusingly, the Dissent cites *A Study of Statutory Blackmail and Extortion in the Several States* as comparative support for the assertion that "no authority has been offered [by the Majority] to suggest that, outside of the Hobbs Act as narrowly interpreted by *Enmons*, laws against extortion have ever been generally understood to be inapplicable to labor unions."  *Id.* at 5 (citing Alice Kramer Griep, Comment, *A Study of Statutory Blackmail and Extortion in the Several States*, 44 MICH. L. REV. 461 (1945)).  Even a cursory look at this article reveals that it does not actually support the stated assertion; this article is from 1945, which is almost thirty years before *Enmons* was even decided, and it also explicitly excludes "threats which are punishable even though no property is demanded"—the exact type of conduct that applies in the context of labor unions—as being outside "the scope of this paper."  Griep, *supra* note 52, at 462.

[44] *See, e.g.*, *United Bhd. of Carpenters v. Bldg. & Constr. Trades Dep't*, 770 F.3d 834 (9th Cir. 2014).

[45] 18 U.S.C. § 1961(1).

First, *United States v. Enmons*[46] and *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*[47] foreclose Hobbs Act liability for a *union* pursuing *legitimate labor objectives*, such as increased pay or better working conditions. This carve-out from Hobbs Act liability for a union pursuing legitimate labor objectives has been termed the "claim-of-right defense."[48] In *Enmons*, the Supreme Court held that this defense protects "the use of violence to achieve legitimate union objectives, such as higher wages in return for genuine services which the employer seeks."[49] There, union members had "fir[ed] high-powered rifles at three Company transformers, drain[ed] the oil from a Company transformer, and bl[ew] up a transformer substation owned by the Company."[50] In finding this conduct was not "extortion" under the Act, the Court first consulted the statutory text. The Court reasoned as follows:

> The term "wrongful," which on the face of the statute modifies the use of each of the enumerated means of obtaining property—actual or threatened force, violence, or fear—*would be superfluous if it only served to describe the means used*. For it would be redundant to speak of "wrongful violence" or "wrongful force" since, as the government acknowledges, any violence or force to obtain property is "wrongful." Rather, "wrongful" has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be "wrongful" because the alleged extortionist has no lawful claim to that property.[51]

The Court also relied on legislative evidence that the Act was not meant to "interfere in any way with any legitimate labor objective or activity" and that "there is not a thing in it to

---

[46] 410 U.S. 396 (1973).

[47] 140 F.3d 494 (3d Cir. 1998)

[48] *See, e.g.*, *United States v. Agnes*, 753 F.2d 293, 299 (3d Cir. 1985), *abrogated by Smith v. Borough of Wilkinsburg*, 147 F.3d 272 (3d Cir. 1998).

[49] *Enmons*, 410 U.S. at 400.

[50] *Id.* at 398.

[51] *Id.* at 399–400 (emphasis added) (citations omitted).

14

interfere in the slightest degree with any legitimate activity on the part of labor people or labor unions."[52]  The Court found that the Hobbs Act simply had no application to labor-management strife when a union is seeking legitimate ends, even if the means chosen are destructive.[53]

We must stress that the Court did not limit this defense to the strike-violence context, as the Dissent seemingly argues. Of course, the *Enmons* Court *focused* on this context as that was the situation before it, but the Court also relied on legislative history stating that the Act was not meant to interfere with "*any*" legitimate labor activity—not just strikes. The Dissent's approach adds language that the Court could have used to limit the application of this act but chose not to. In doing so, the Dissent implicitly suggests that labor unions should have more latitude in a strike than in negotiations that may precede a strike.[54]  This would have absurd consequences in which companies would be subjected to strikes even though they were willing to continue negotiations and unions would be encouraged to go on strike merely to access additional negotiating tools, thereby injuring their employees and employers.  Neither Congress nor the Supreme Court would have intended such an impractical and counterproductive approach to the law of extortion.  Logically, if even violence in the pursuit of core union objectives is not Hobbs Act extortion, then it is obvious that non-violent forms of coercion, such as the economic pressure tactics employed here, are similarly subject to a broad labor-context claim-of-right

---

[52] *Id.* at 404 (emphasis added).

[53] The *Enmons* Court clarified that the scope of legitimate labor objectives excludes, for example, threats to obtain "personal payoffs" or force the hiring of no-show workers. *Id.* at 400.  The claim-of-right defense is thus inapplicable where a union uses coercive tactics—whether violent or non-violent—to "exact 'wage' payments from employers in return for 'imposed, unwanted, superfluous and fictitious services' of workers." *Id*.

[54] Although the Dissent claims to "make no distinction . . . between conduct during strikes and conduct during other labor negotiations activities," interpreting *Brokerage Concepts* as narrowly as the Dissent would like would functionally create this distinction whether the Dissent explicitly recognizes that or not.  Dissent at 11, n.10.

defense.[55]   The Dissent argues that "[n]othing in *Brokerage Concepts* . . . creates a special immunity for labor unions to extort business concessions through economic fear."[56] But our decision in *Brokerage Concepts* amply supports subjecting economic pressure tactics to the claim-of-right defense.   In *Brokerage Concepts*, we concluded that economic pressure is not "'inherently' wrongful" and can fall outside of the Hobbs Act even in *non-labor* contexts.[57]   Clearly, a union's use of sharp-edged economic means or "hardball" tactics must receive the same "carve-out" from Hobbs Act liability as far more militant tactics.  It would be a bizarre outcome indeed if the Act subjected organized labor to extortion prosecutions for hard bargaining with management but immunized labor organizations when that bargaining spills over into violence.[58] In arguing to the contrary, the Dissent manifests an unwillingness to concede the reality of labor strife and the pressures surrounding it.  After all, every strike, as well as the threat of a strike, is nothing more than an attempt to extort business concessions through economic fear and intimidation.

---

[55] *See, e.g.*, *United States v. Mulder*, 273 F.3d 91, 98, 104–06 (2d Cir. 2001) (explaining how the district court was "correct" to instruct the jury regarding the labor exception where allegedly extortionate conduct at issue included non-violent "threats of slowdowns" as well as violence).  *See also* James J. Brudney, *Collateral Conflict: Employer Claims of Rico Extortion Against Union Comprehensive Campaigns*, 83 S. CAL. L. REV. 731, 779 (2010) ("The *Enmons* holding applies a fortiori to property obtained through fear of economic injury, which, unlike force or violence, is not inherently suspect as a form of pressure.").

[56] Dissent at 9.

[57] *See Brokerage Concepts*, 140 F.3d at 523; *see also United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO*, 770 F.3d 834, 838 (9th Cir. 2014); *United States v. Sturm*, 870 F.2d 769, 773 (1st Cir. 1989).

[58] *Cf. United States v. Vigil*, 523 F.3d 1258, 1265 (10th Cir. 2008) (citing *Enmons* for the proposition that "economic fear arising from hard bargaining is permitted, for example in the union context").  Indeed, we have been unable to find (and the Dissent does not cite) a single case in which a union was subjected to Hobbs Act liability for purely economic threats directed at management in pursuit of legitimate labor ends.

This application of *Enmons* finds further support in the caselaw of our sister Courts of Appeals, which have recognized that *Enmons*'s holding is generally applicable to labor-management conflicts. In *United States v. Quinn*, for instance, the Fifth Circuit relied on *Enmons* to declare that

> the Hobbs Act does not condemn the use of *coercive measures* to obtain wage increases, provided labor furnishes the employer with genuine services in exchange for the wages sought. . . . [T]he effect of *Enmons* was to remove from the reach of federal criminal law the use of *coercive tactics* to obtain increased wages, but with the caveat that the prosecutor's hand would be stayed *only* when the payment is gained in furtherance of legitimate labor objectives.[59]

Similarly, in *United States v. French*, the Eighth Circuit stated that *Enmons* stands for the proposition that "the Hobbs Act does not cover *coercive action by unions* in pursuit of legitimate labor goals of higher wages or increased benefits"—again, not limiting its reach to the strike context as the Dissent argues.[60] And in *United States v. Gibson*, the First Circuit upheld as "accurate" jury instructions stating that the Hobbs Act does not "condemn the use of *coercive measures* to obtain wage increases or to carry out a collective bargaining agreement, if there is an agreement between union and an employer."[61] These cases plainly read *Enmons*'s claim-of-

---

[59] 514 F.2d 1250, 1257 (5th Cir. 1975) (first and second emphasis added); *see Coercion*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Compulsion of a free agent by physical, moral, *or economic force* or threat of physical force.") (emphasis added).

[60] 628 F.2d 1069, 1075 (8th Cir. 1980) (emphasis added).

[61] 726 F.2d 869, 874 (1st Cir. 1984) (emphasis added). *See also United States v. Zappola*, 677 F.2d 264, 269 (2d Cir. 1982) (explaining how *Enmons* "carved out a labor exception to the traditional law of extortion codified in the Hobbs Act"); *Mulder*, 273 F.3d at 104 ("There is a labor exception to culpability for Hobbs Act extortion."). Although there is caselaw reading *Enmons* as narrowly concerned with strike

right defense as applicable to any coercive labor action aimed at legitimate objectives; there is no defensible distinction to be drawn between violent and non-violent tactics.[62]

In sum, reading *Enmons* along with *Brokerage Concepts* and other cases construing the claim-of-right defense makes clear that the Unions cannot be liable under the Hobbs Act for nonviolent pressure tactics directed against

violence, none of these cases explicitly address the question of non-violent labor-management strife and most predate our decision in *Brokerage Concepts*, in which we relied on *Enmons*'s reasoning to cross-apply the claim-of-right defense to general economic activity. *See, e.g.*, *Agnes*, 753 F.2d at 299; *Brokerage Concepts*, 140 F.3d at 503 (cross-applying *Enmons* while being "mindful" of earlier cases such as *Agnes*); *id*. at 523 ("The limitation we apply is that set forth in *Enmons*: that a defendant is not guilty of extortion if he has a lawful claim to the property obtained."); *see also United States v. Tobin*, 155 F.3d 636, 640 (3d Cir. 1998) (applying *Enmons* in the context of "labor-management conflicts" even before *Brokerage Concepts*). Further, in *Brokerage Concepts*, we observed that the "line of cases limiting *Enmons*" had no bearing on cases involving "solely" the use of economic threats. 140 F.3d at 523. Moreover, cases that spoke of "narrowly" construing *Enmons* tended to do so when asked to apply its holding *beyond* the labor-management strife context, rather than to *nonviolent* instances thereof. *See, e.g.*, *United States v. Cerilli*, 603 F.2d 415, 419 (3d Cir. 1979) (observing that "*Enmons* is a labor case" in refusing to apply its reasoning to the coercive solicitation of political contributions); *see also United States v. Thordarson*, 646 F.2d 1323, 1330 (9th Cir. 1981) (refusing to extend the *Enmons* defense to other criminal statutes). *United States v. Debs* also falls in this category. 949 F.2d 199, 201 (6th Cir. 1991). There, the Sixth Circuit declined to extend the claim-of-right defense to *intra*-union threats and violence. *Id*. at 200–01.

[62] The concurring opinion in *United States v. Russo* is also instructive here: "While caution should be exercised in extending *Enmons* too far—especially to cases outside the labor context—equal, if not greater, caution should be exercised in *not* applying *Enmons* to cases such as ours which *do* involve labor disputes." 708 F.2d 209, 224 (6th Cir. 1983) (Holschuh, J., concurring) (emphasis in the original).

18

management in support of legitimate objectives. The Unions were seeking to advance a legitimate labor goal: forcing Care One to provide better wages and working conditions to Union members. To this end, the Unions employed hard-nosed pressure tactics. Although some may condemn such strategies, they are not actionable under the Hobbs Act.

Our dissenting colleague would demand more than *Enmons* and our caselaw require, arguing that a "reasonably close relationship" between the Unions' ends and means is required for the claim-of-right defense to apply.[63] We can discern no such requirement in the cases. Indeed, the extreme coercive means employed by the union in *Enmons*—"firing high-powered rifles at three Company transformers, draining the oil from a Company transformer, and blowing up a transformer substation owned by the Company"[64]—sound like exactly the sort of "counterproductive" and "collateral" acts that the Dissent contends *should* subject labor organizations like the Unions to potential extortion liability.[65] As we noted earlier, the Dissent would inappropriately subject the viability of these unions' claim-of-right defense to a *higher* bar in the context of nonviolent economic campaigns than would apply if there had been actual violence.[66] As we explained, it would be illogical to interpret *Emmons* and its progeny in a manner that encourages unions to go on strike so that they have wider latitude than they are afforded while they remain at the bargaining table.

The Dissent cites two cases to support the contention that there must be a "close relationship" between the means employed and a legitimate objective: *United States v. Jackson*[67] and the *United States v. Villalobos* concurrence.[68]

---

[63] *See* Dissent at 16.

[64] 410 U.S. at 398.

[65] *See Brokerage Concepts*, 140 F.3d at 504 (finding claim-of-right defense still applied where threatened conduct concerned an "unrelated market"). In effect, the Dissent would have us ignore, not just the language and holding of *Enmons*, but what necessarily follows therefrom.

[66] *See* Dissent at 15–16.

[67] 180 F.3d 55, 70 (2d Cir. 1999), *rev'd on reh'g on other grounds*, 196 F.3d 383 (2d Cir. 1999). *See* Dissent at 16.

[68] 748 F.3d 953, 959 (9th Cir. 2014) (Waterford, J., concurring in the judgment). *See* Dissent at 16.

But these are distinguishable as neither analyzes the claim-of-right defense in the context of labor-management strife, the key fact here.[69]  Indeed, the *Jackson* Court and *Villalobos* concurrence do not even cite *Enmons*, the foundational case regarding potentially extortionate labor action.  Nor is this an isolated misstep in the Dissent's analysis.  Our colleague mistakenly cites non-labor cases throughout the Dissent in an attempt to stretch the Hobbs Act to reach the conduct at issue here.  For example, in citing the concurrence in *Villalobos*, the Dissent overlooks the fact that the majority there specifically noted: "In *United States v. Enmons*, the Supreme Court concluded that the use of force to achieve legitimate labor ends was not extortion."[70]  And in citing *United States v. Agnes*, the Dissent ignores that we there acknowledged "Judge Higgenbotham's cogent warning in *Cerilli*" that "[a]ny application of *Enmons* to cases *outside* of [the labor] context must be done with caution.  Otherwise there is a danger that *Enmons* . . . could effectively repeal the Hobbs Act."[71]  These examples illustrate how the Dissent consistently confuses one axis of limitation—the refusal to apply *Enmons* to violent non-labor actions—for another—whether *Enmons* applies to non-

---

[69] In *Jackson*, the defendants attempted to extort Bill Cosby by threatening to disclose that one of them was his illegitimate daughter.  180 F.3d at 55–65.  In *Villalobos*, a lawyer attempted to extort the target of a criminal investigation by offering to have his client obstruct it in exchange for money.  748 F.3d at 955.  The Ninth Circuit relied on the premise that "outside the labor context, there are some attempts to obtain property that are . . . inherently wrongful."  *Id*. at 956.  The Dissent also cites *United States v. Tobin* to insist that the means the Unions employed matter to the claim-of-right defense's applicability.  Dissent at 14.  But *Tobin* involved a campaign of telephone harassment following the defendant's failed attempt to be hired as a band's booking agent—no labor organization was involved.  155 F.3d at 638–39.

[70] *Villalobos*, 748 F.3d at 956.  *See* Dissent at 16 (citing *Villalobos*, 748 F.3d at 959) (Watford, J., concurring in the judgment)).

[71] *Agnes*, 753 F.2d at 299 n.4 (citing 603 F.2d at 419) (second alteration in original) (emphasis added).

violent labor actions.[72]  The caselaw cannot fairly be read to foreclose the application of *Enmons* to non-violent actions against management undertaken by unions pursuing legitimate objectives.

In sum, the unique protections from Hobbs Act liability that Congress has afforded unions in the context of labor disputes informs and defines our holding.  We do not expand or modify the claim-of-right defense as it applies in the non-labor context; no fair reading of our analysis will lead to that result.

We obviously do not condone inappropriate threats or unreasonably coercive conduct.  But since Care One is seeking relief by means of a RICO claim based on predicate acts of extortion, its claim is subject to the Unions' claim-of-right defense based on the Unions' legitimate objectives.  Since 1973, when the Supreme Court decided *Enmons*, it has been clear that "the [Hobbs] Act does not apply to the use of force to achieve legitimate labor ends."[73]  Indeed, the Court proclaimed then that "[i]n the nearly three [now seven] decades . . . since the enactment of the Hobbs Act, no reported case has upheld the theory that the Act proscribes the use of force to achieve legitimate collective-bargaining demands."[74]  If Congress wishes to change the law so that consideration of a union's means plays a role in the analysis, it certainly can do so.  Until it does, *Enmons* and *Brokerage Concepts* instruct that the legitimacy of the Union's objective is the touchstone of the analysis.

Labor is simply different.  The underlying purpose of a strike—the ultimate tool of labor—is, after all, inflicting harm on an employer's business to exert such economic loss (or threat of loss) upon that business that the employer agrees to labor's demands.  Accordingly, as long as unions pursue legitimate labor objectives, their coercive tactics are simply not subject to liability under the Hobbs Act.

This does not suggest that the victim of allegedly illegal union activity is without remedy.  There may well be state law remedies or recourse to other federal laws.  However, Care One seeks recovery under the Hobbs Act, and its reach has well-defined limits.  The Supreme Court long ago interpreted the

---

[72] *See supra* note 71.

[73] *Enmons*, 410 U.S. at 401.

[74] *Id.* at 407.

Act to create a carve-out for union conduct in pursuit of legitimate labor objectives. That interpretation controls here.

### b. Extortion through Sabotage

Care One contends that, based on the timing of the aforementioned acts of sabotage and the fact that NEHCEU members had access to both the facilities and patients involved, a reasonable jury could infer that Union members committed sabotage.[75] We do not disagree. But such an inference, though reasonable, would fall woefully short of the proof required under § 6 of Norris-LaGuardia because it is not enough to transform the acts of any such union members into acts of the Unions.

Section 6 of the Norris-LaGuardia Act states:

> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.[76]

The Supreme Court has explained that "'authorization' as used in § 6 means something different from corporate criminal responsibility for the acts of officers and agents in the course or scope of employment."[77] Rather, Congress intended to restrict

> liability in labor disputes . . . for unlawful acts of the officers or members [of unions], although [they] are acting within the scope of their general authority as such officers or members [of those unions] . . . except upon clear proof that the particular act charged, or acts generally of that type and quality, had been expressly authorized,

---

[75] Appellants' Br. at 18.

[76] 29 U.S.C. § 106.

[77] *United Bhd. of Carpenters v. United States*, 330 U.S. 395, 406 (1947).

22

or necessarily followed from a granted authority [by the union] or was subsequently ratified [by the union] after actual knowledge of its occurrence.[78]

Thus, a labor union cannot be held liable for the actions of its members (even if those members are officers of the union) absent "*clear proof* of actual participation in, or *actual* authorization of, such acts, or of ratification of such acts after *actual* knowledge thereof."[79] The standard thus requires "clear, unequivocal, and convincing proof" rather than "a bare preponderance."[80] District courts must apply the same standard at summary judgment that would apply at trial, asking "whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant."[81] Because § 6 of Norris-LaGuardia Act requires "clear, unequivocal, and convincing proof" at trial, the same standard of proof would be required at the summary judgment level.[82]

There is a heightened standard here because unions require heightened protection. The Court explained in *United Brotherhood of Carpenters and Joiners of America* that the limitation set forth in § 6 was intended to:

relieve [labor unions] . . . from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization without clear proof that the organization or member, charged with responsibility for the offense,

---

[78] *Id.* at 407. The Court noted that the Senate Committee viewed this as "'a rule of evidence,' not a 'new law of agency.'" *Id.* at 402. However, the distinction is purely academic for our purposes and does not affect our analysis. For a thorough discussion of the complete legislative history of § 6 of the Norris-LaGuardia Act, see *id.* at 401–03.
[79] 29 U.S.C. § 106 (emphasis added).
[80] *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 737 (1966).
[81] *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).
[82] *See Gibbs*, 383 U.S. at 737.

actually participated, gave prior authorization, or ratified such acts.[83]

When Congress enacted the Norris-LaGuardia Act in 1932, it did so to "bring some order out of the industrial chaos that had developed and to correct the abuses that had resulted from the interjection of the federal judiciary into union-management disputes on the behalf of management."[84] Federal courts were then "regarded as allies of management in [their] attempt to prevent the organization and strengthening of labor unions; and in this industrial struggle the injunction became a potent weapon that was wielded against the activities of labor groups."[85]

Moreover, in *United Mine Workers of America v. Gibbs*, the Supreme Court noted that while the Labor Management Relations Act passed shortly after the decision in *United Brotherhood of Carpenters* and allowed a less stringent standard of proof, Congress did not repeal § 6 of the Norris-LaGuardia Act.[86] Rather, it "left it applicable to cases not arising under the new Act."[87] The Supreme Court took that opportunity to reiterate that the "driving force" behind § 6 of the Norris-LaGuardia Act was the "fear that unions might be destroyed if they could be held liable for damage done by acts beyond their practical control."[88] It is therefore now beyond contention that common-law principles of agency and *respondeat superior* have no place in assessing liability of labor unions for the acts of their members or officers for claims (such as the ones before us) not falling under the Labor Management Relations Act.

As this case arises under RICO rather than the Labor-Management Relations Act, it falls under § 6, which applies to cases "not arising under the [Labor-Management Relations

---

[83] *United Bhd. of Carpenters*, 330 U.S. at 403.
[84] *Boys Mkts., Inc. v. Retail Clerks Union*, 398 U.S. 235, 251 (1970).
[85] *Id.* at 250.
[86] *Gibbs*, 383 U.S. at 736.
[87] *Id.*
[88] *Id.* at 736–37.

Act]."[89]  The District Court did err in employing the less stringent Labor Management Relations Act (LMRA) standard, "that defendants can only be held responsible for the actions of their members if unions authorized or ratified the acts."[90]  In doing so, it cited *Carbon Fuel Co. v. United Mine Workers of America*, which explained that under the LMRA, liability is limited to those who had "authorized, participated in, or ratified" the conduct.[91]  However, that error benefitted Care One because it allowed Care One a less stringent standard of proof for surviving summary judgment.

The investigation by the Connecticut State's Attorney closed without even identifying any suspects, let alone any union-member suspects.  Furthermore, union membership alone would not tie the actions of any such members to the Unions.  We have already explained that the Supreme Court has stressed that common-law agency principles are not enough to pin the acts of union members (or even union officers) to the hide of their union for claims not arising under the LMRA.  The law requires that Care One establish that the Unions authorized or ratified such conduct within the narrow meaning of § 6 of the Norris-LaGuardia Act, and the evidence of that must amount to "clear proof" of such authorization or ratification.[92]  The evidence here simply does not rise to that standard.

**(i) Authorization**

First, there is no admissible evidence that the Unions authorized the acts of sabotage and vandalism.  Care One reminds us that similar acts were performed at three facilities targeted by the strike and on the eve of the strike, and that these acts were similar to the sabotage allegedly connected with a strike at another employer's NEHCEU-unionized facility in 2001.  Care One suggests that we can connect those dots and

---

[89] *Id.* at 736.  *See United Bhd. of Carpenters*, 330 U.S. at 403 (applying § 6 to Sherman antitrust prosecution); *United States v. Kemble*, 198 F.2d 889, 892 (3d Cir. 1952) (applying § 6 to Hobbs Act extortion prosecution).

[90] *Care One*, 2019 WL 5541410, at *6 (citing *United States v. White*, 322 U.S. 694, 702 (1944) and *Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 216–17 (1979)).

[91] *Carbon Fuel*, 444 U.S. at 216.

[92] 29 U.S.C. § 106.

conclude that the Unions authorized the conduct. For support, they invoke the "mass action" theory, citing *Eazor Express, Inc. v. International Brotherhood of Teamsters.*[93] Under the mass action theory, union authorization explains an otherwise inexplicable or improbable pattern of coordinated conduct by members.[94] The premise is that "large groups of [people] do not act collectively without leadership and that a functioning union must be held responsible for the mass action of its members."[95] The mass action theory emerged to address situations in which thousands of members in different locations simultaneously act in concert.[96] In contrast, here, there is no evidence that more than a few people acted and Care One does not contend otherwise.[97] Care One insists that it is applying the logic underlying the mass action theory and relying on common sense based on the timing and apparent coordination of the actions rather than the mass action theory per se. However, Care One cites no cases that would justify expanding the logic of the mass action theory to the circumstances here, and we have found none. The number of actors here falls woefully short of the numbers needed to infer that the Unions had to have orchestrated these acts. The number is just too small for the presumption of centralized Union coordination to apply. Moreover, even if we were to agree that the timing of the acts suggests unseen coordination, there is nothing to tie it to the Unions as opposed to a handful of individual union members acting on their own. The contrary assumption Care One relies on is far too tenuous to rise to the level of substantial proof required by § 6 of the Norris-LaGuardia Act.

Care One also points to certain vague remarks by the agents of the Union to argue authorization. It argues that Union documents revealed plans to persuade workers to "become

---

[93] *Eazor Express, Inc v. Int'l Bhd. of Teamsters*, 520 F.2d 951, 963 (3d Cir. 1975)*, overruled on other grounds by Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212 (1979).

[94] *Id.*

[95] *Id.*

[96] *See Consolidation Coal Co. v. Local 2216*, 779 F.2d 1274, 1275 (7th Cir.1985) (applying mass action to when 350,000 to 450,000 coal miners went on strike).

[97] *See Care One Mgmt., LLC*, 2019 WL 5541410, at *6.

angry about their working conditions"[98] and to take on "more militant" levels of activity.[99] But to satisfy the evidentiary threshold of Norris-LaGuardia, Care One must present "clear proof that the particular act charged, or acts generally of that type and quality, had been expressly authorized, or necessarily followed from a granted authority."[100] We cannot conclude that these statements expressly authorized the alleged predicate acts without greatly weakening the fabric of Norris-LaGuardia and undermining the congressional intent behind it.

The acts of vandalism, etc., do not "necessarily follow[]" from these abstract statements.[101] Those statements were in a facilitator lesson-planning worksheet and a written evaluation for one organizer, respectively.[102] Care One also points to the NEHCEU's president's statement to workers that "the law takes too long" and that NEHCEU "could be destroyed by the time the law was able to stop [Care One's] behavior."[103] Here again, the suggested inference is just too tenuous a thread to tie the Unions to the acts of vandalism. It simply does not follow that the Unions were authorizing acts of vandalism and sabotage by complaining about delays in the legal process.

Moreover, as the District Court recognized, the evidence here is to the contrary. Even internally, NEHCEU's communications director condemned the behavior. He wrote to fellow employees stating: "Of course anyone with a pea-sized brain would realize this isn't a tactic we would undertake."[104]

Our finding that the evidence could not lead a properly instructed jury to conclude that the Unions authorized this conduct is not akin to "nothing to see here; move along," as our dissenting colleague suggests. This suggestion coupled with the assertion that there is "indeed something to see, and a jury

_____

[98] JA 5852, a facilitator teaching document with the goal of "answer[ing] tough questions and redirect[ing] conversations to an organizing agenda."

[99] JA 5849, a supervisor's evaluation form for an individual organizer.

[100] *United Bhd. of Carpenters*, 330 U.S. at 406–07.

[101] *See id.*

[102] *See* JA 5852 and 5849.

[103] Appellants' Br. at 22.

[104] JA 6825.

should see it,"[105] makes clear that the Dissent does not fully appreciate the heightened standard of review required here. Under this standard of review, a jury may not "see it" if there is not clear proof. This does not mean we are saying "move along" (i.e., grant summary judgment) because we are ignoring the relevant evidence, but rather because, after a careful review of said evidence, it clearly falls short of the required standard.

Even the *Fry v. Airline Pilots Association International* case, which the Dissent relies on when asserting that "'[c]lear proof' is not an unreachable standard," supports that the evidence here fails to reach it.[106] The *Fry* Court stressed that any alleged authorization would have to be "very obvious."[107] For the reasons discussed above, the evidence here is a far cry from very obviously suggesting authorization. Moreover, *Fry* involved much more convincing evidence than we have here. This included "the words 'show no mercy'" written on a union bulletin board with the names of the people some union members had harassed listed underneath and evidence that the union chairperson failed "to deny an allegation that 'Union Leadership continue[d] to encourage [post-strike harassment] and refuse[d] to take any steps to stop it."[108] And even with this clearer evidence, the Tenth Circuit still found that the proof was not clear enough to get past summary judgment. Compare this to our case in which we have both vague statements that do not clearly incite the vandalism as well as the Unions' explicit condemnation of the vandalism. If the evidence in *Fry* falls short of clear proof of authorization requiring granting the union's motion for summary judgment, then the evidence here necessarily falls short of this heightened standard too.

**(ii) Ratification**

As explained above, even if the Unions did not authorize this conduct, they are nevertheless liable if they ratified it. To show ratification, Care One must show "either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law or

---

[105] Dissent at 26.
[106] *Id.* at 24 (citing *Fry v. Airline Pilots Ass'n, Int'l*, 88 F.3d 831, 842 (10th Cir. 1996)).
[107] *Fry*, 88 F.3d at 842–43.
[108] *Id.* at 843.

intentionally drew upon the previous violence for their force."[109]  In addition, as we have stressed at length, Care One would need to show "clear proof" of such ratification.[110]  Care One argues that union officials made "no concrete effort to disassociate themselves from the misconduct,"[111] and that apparent lack of concern is itself enough to show ratification. It cites *Yellow Bus Lines* to support this contention.[112]  In *Yellow Bus Lines*, there was evidence that the union local's business director, James Woodward, had engaged in several acts of vandalism including threatening to burn company buses.[113]  The president of the union received a letter describing "with particularity 'numerous incidents of threats, violence, property damage, and verbal abuse' by Woodward and other strike participants."[114]  There was no evidence to show that the unions acted to investigate or discipline Woodward (or any other strikers).  More importantly, "Woodward remained on-site as the Local's man in charge."[115] The court held that evidence was sufficient to show that the union had liability for Woodward's action because its inaction after learning of accusations against Woodward ratified his conduct.[116] Clearly, this case is different.  Assuming *arguendo* that lack of concern constitutes approval, this record does not support a conclusion that union officials made no concrete effort to disassociate themselves from the violence. NEHCEU's communications director wrote that the allegations of vandalism were "very serious indeed" and that those responsible "should be held fully accountable."[117]  This is in direct contrast to the response of the union in *Yellow Bus*

---

[109] *Gibbs*, 383 U.S. at 739.

[110] 29 U.S.C. § 106.

[111] Appellants' Br. at 26.

[112] *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Loc. Union 639*, 883 F.2d 132, 136 (D.C. Cir. 1989), *on reh'g en banc*, 913 F.2d 948 (1990).

[113] *Id.* at 135.

[114] *Id.* at 136.

[115] *Id.*

[116] *Id.*

[117] JA 1068.

*Lines*, which was tantamount to the proverbial "wink and a nod."[118]

Care One argues that a reasonable jury could find the Unions ratified the sabotage after the fact because the Unions "sought to 'mudd[y] the waters' and 'rebut, or at least confuse, the sabotage claims'"[119] rather than to assist the police investigation.[120] Despite some of the Unions' rhetoric, it is far from clear that the Unions sought to "muddy the waters." Indeed, the relevant email that Care One's argument rests on merely reported results from a response to a FOIA request. It described the information from that FOIA response as "mudd[ying] the waters and support[ing] the contentions of the workers that" the patients may have removed their identifying bracelets themselves rather than saboteurs.[121] Congress gave unions increased protection from liability by setting a standard of clear proof.[122] No fair reading of the email suggests that the Unions approved the actions by even the lowest standard of proof. It therefore certainly does not establish any such approval by clear proof.

Care One also points to an email suggesting it would be "a very bad idea" to participate in the police investigation.[123] But read in context, that email explains that the Unions should not "suggest [they] have information [they] don't have" and that they have an obligation to their members even if it turned out the members were guilty.[124] Here, it must be remembered that subsequent investigation yielded no suspects or implicated any Union members.

---

[118] We realize, of course, that it is certainly possible that any statements by the Union condemning the vandalism and sabotage were made solely to provide "cover" and that any Union members participating in the vandalism understood that. However, without sufficient proof that statements condemning the destruction were nothing more than a disingenuous self-serving response, we cannot attribute such nefarious motivations to the Unions or their communications.

[119] Appellants' Br. at 25 (citing JA 5842).

[120] *Id.* (citing JA 5831).

[121] JA 5842.

[122] 29 U.S.C. § 106.

[123] JA 5831.

[124] *Id.*

Care One also contends that the Unions went as far as "authoring a baseless article suggesting that Care One 'staged the sabotage to make [NEHCEU] look bad.'"[125] However, the article, written by the Unions' communications director, attributes the "staged the sabotage" quotation to members and indeed members who disbelieved the allegations of sabotage.[126] That is not evidence that the Unions had any such belief. Moreover, even if we were to attribute such a belief to the Unions, it would still fall short of the clear proof needed to allow us to conclude that the Unions ratified the acts of vandalism and sabotage after the fact.

## 2. Mail and Wire Fraud

### a. Unions' Fact-Checking Process

Care One asserts claims of mail and wire fraud based on the allegedly false and misleading advertisements. The District Court granted summary judgment to the Unions on those claims because the proof of the requisite element of specific intent to defraud was lacking.[127] It found no specific intent to deceive because the Unions had fact-checking and vetting procedures in place, and the people who researched, drafted, and approved the publications believed the advertisements to be truthful.[128]

Care One argues that there were material disputes of fact as to whether such procedures existed or whether the procedures were followed if they did exist. After reviewing the affidavits submitted by both sides on the summary judgment motions, we hold that the trial court did not err. Care One argues that UHWE Assistant for Strategic Organizing Amy Gladstein revealed that the Unions lacked such vetting procedures, but that is a misreading of the record. Gladstein merely denied that their protocols were as strict as in "a laboratory."[129] But she emphasized that the Union researchers were trained to conduct careful research, and that the advertisements were based on initial fact gathering.[130]

---

[125] Appellants' Br. at 25–26 (citing JA 5825).

[126] JA 5825.

[127] *Care One*, 2019 WL 5541410, at *9.

[128] *Id.* at *10.

[129] JA 3718–19.

[130] JA 7994.

Care One also contends that a union employee admitted that communications were published without approval. However, that employee merely specified that the procedure did not require a sign-off by him. In doing so, he reaffirmed that the work had to be "vetted by the research department for accuracy."[131] Care One points to a communications employee who admitted that when she was promoted to a senior position, she could send out certain things without her supervisor's "review," though there were categories of things that still required her supervisor's review.[132] None of this contradicts the process the Unions outlined. This process included fact-checking and vetting communications and not releasing anything without approval by an officer or senior staff employee with authority.[133] Care One can point to specific officers or senior staff who did not do any fact-checking, but that does not negate the evidence that certain researchers and outside counsel did fact-check, even if others did not.[134] There is information in the record, for example, that cite-checking was "Megan [Thorsfeldt's] job."[135]

We have previously affirmed summary judgment dismissal of a defamation claim where defendants filed uncontradicted affidavits that "averred that they were convinced of the truthfulness" of their statements.[136] Here, the Unions' affidavits provide sufficient evidence that the affiants believed that all the material in the advertisements was truthful and accurate. None of the portions of the record Care One relies on raises a genuine issue of fact sufficient to defeat the Unions' motion for summary judgment.

---

[131] JA 2761.

[132] JA 5308.

[133] JA 7994.

[134] *See* JA 2642 (vetting was conducted on the research side and legal side); JA 5134 (accuracy was the responsibility of "our research team" and "counsel"); JA 3718 (Gladstein explaining that "my researchers" were responsible for accuracy).

[135] JA 5327.

[136] *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 276 (3d Cir. 1980).

### b.     Reckless Disregard

Care One claims the District Court should have looked beyond the fact-checking procedures because fraud "may be effected by deceitful statements of half-truths or the concealment of material facts" even if the text is true.[137]  Care One then argues that we can find specific intent because advertisements were "(at best) deceitful half-truths" that advanced the Unions' scheme and whose purpose was to "harm Appellants' business."[138]

Specific intent "may be found from a material misstatement of fact made with reckless disregard for the truth."[139]  However, reckless disregard for the truth cannot be inferred merely from an intention to injure.[140]  It requires "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."[141]  Failure to investigate before publishing is not enough to establish reckless disregard, without more.[142]

Care One points to specific ads and claims the Unions cherrypicked facts and disrobed them of their necessary context.  In the four ads in question, Care One accuses the Unions of asking a leading question that implies a negative answer and highlights negative information, supported by a non-representative fact or statistic.

For example, as quoted above, Care One points to the advertisements targeting its staffing.  Those advertisements ask: "Are HealthBridge Nursing Homes Employing Enough Caregivers For Our Loved Ones?"  They then assert that Care One provided below-average coverage by certified nursing assistants.[143]  The ads omit that Care One facilities provide

---

[137] Appellants' Br. at 43 (citing *United States v. Ferriero*, 866 F.3d 107, 120 (3d Cir. 2017) (quoting *United States v. Bryant*, 655 F.3d 232, 249 (3d Cir. 2011)).

[138] Appellants' Br. at 42.

[139] *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995) (citation omitted).

[140] *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 n.7 (1989).

[141] *Id.* at 688 (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

[142] *Id.* (citing *St. Amant*, 390 U.S. at 733).

[143] JA 2491.

above-average hours of coverage by the higher-skilled registered nurses (RNs) and licensed practical nurses (LPNs).[144]

However, the law of defamation generally recognizes that a question, "however embarrassing or unpleasant to its subject, is not an accusation."[145]  To premise liability on a question would "necessarily ensnare a substantial amount of speech that is essential to the marketplace of ideas."[146]  Moreover, the questions' implied answer is merely an unfalsifiable "opinion relating to matters of public concern."[147]  Even if the Unions were using the questions to assert that Care One "understaff[s]" their facilities, that assertion would merely compare Care One's staffing to a subjectively chosen correct number.

The same analysis applies to the other questions in the Unions' advertisements: "Is HealthBridge Giving Your Loved One Anti-Psychotic Drugs?,"[148] "Overbilled at a HealthBridge Nursing Home?,"[149] and "Who's in charge At HealthBridge Nursing Homes?"[150]  These are all questions rather than factual misrepresentations.  They point out a presumed disparity between HealthBridge's behavior and a subjective standard.

Care One suggests that the statistic in the staffing ad is fraudulent because it implies that Care One understaffs by relying on information pertaining to the only category of staff with below-average numbers.  Amanda Torres-Price, communications specialist for UHWE, conceded that the advertisements were "not pretending to be objective."[151]  However, speakers in the public square "have no legal obligation to present a balanced view."[152]  The Unions had no

---

[144] JA 3348–49 and 5642.

[145] *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338 (D.C. Cir. 2015) (citation omitted).

[146] *Id.* at 1339.

[147] *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001) (citation omitted).

[148] JA 2501.

[149] JA 2477.

[150] JA 2494.

[151] JA 5311.

[152] *Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408, 412 (6th Cir. 1991).

duty to give a fair, holistic representation in their advertisements.

The law does not require the Unions to present a balanced view in their other advertisements. Care One points out that the antipsychotics advertisements suggesting its facilities excessively administered medications relies on a statistic referring to non-representative groups of patients, for whom the antipsychotic drugs were often medically appropriate. The overbilling advertisements were based on one billing error at only one facility. And the "Who's in charge" advertisements implied there was an unhealthy amount of turnover but cited turnover rates roughly in line with a state average. Care One doesn't dispute the actual statistics, merely the implications and the insinuations arising from them. It is unrealistic to expect that either side of a labor dispute will present a balanced view in advertisements pertaining to that dispute. Moreover, for better or worse, the law does not hold either party to a labor dispute to a given level of objectivity.[153]

**IV.**

For the reasons set forth above, we will affirm the District Court's judgment.

---

[153] This does not, of course, license either side to a labor dispute to say whatever will inflict maximum damage on the other side with absolutely no regard for the accuracy of those statements. Here, as we have discussed, the Unions did have processes in place to maintain a level of accuracy in its public pronouncements. And the record does not support any conclusion that those processes were little more than a Potemkin Village intended only to provide cover so that the Unions could say whatever they thought would damage Care One. There is no evidence that the Unions had "serious doubts" about the truthfulness of the statements. *Harte-Hanks Commc'ns*, 491 U.S. at 688.

*Care One v. United HealthCare*, No. 19-3693
JORDAN, *Circuit Judge*, dissenting

Congress has indeed provided a wide playing field for unions and businesses to engage in the rough and tumble of collective bargaining. But that field still has limits. I respectfully dissent because the Majority Opinion in this case dismisses troubling evidence of extortionate threats by the defendant Unions.[1] According to the Unions and my colleagues in the Majority, even threats of criminal prosecution and crippling regulatory obstruction are simply hard bargaining, as long as they're pressed by labor unions, and any question of whether the Unions actually authorized or ratified acts of violent sabotage is too weak to go to a jury. I think the case presents some close questions but there is enough to give the plaintiff, Care One, its day in court.[2] I would therefore vacate the District Court's judgment and remand for trial.

## I. Labor unions are not immune from RICO liability predicated on violations of state laws against extortion.

Because Care One's RICO claims rely on predicate acts of "extortion … chargeable under State law[,]" 18 U.S.C. § 1961(1)(A), Care One must show that the alleged predicate acts both violate a state extortion law and satisfy the "generic" definition of extortion as interpreted in federal case law.

---

[1] I refer to the defendants collectively as the "Unions," and, when speaking of one of them, use the singular, "Union."

[2] Like the Majority, I refer to the various plaintiffs in the singular as "Care One."

*United States v. Kirsch*, 903 F.3d 213, 225 (2d Cir. 2018). As to the first showing, Care One has described in its complaint several extortion offenses violative of Connecticut, Massachusetts, and New Jersey statutes. Unlike the federal Hobbs Act, those state laws list specific things that amount to extortion, including threats of criminal prosecution or regulatory obstruction.[3] Also unlike the Hobbs Act as it is interpreted by the Majority, none of those state laws creates a categorical allowance for labor unions to engage in extortionate behavior.[4] It seems clear to me that Care One has

---

[3] Under Connecticut law, extortion includes, among other conduct, "compel[ling] or induc[ing] another person to deliver … property to himself or a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will … accuse some person of a crime or cause criminal charges to be instituted against him[.]" Conn. Gen. Stat. § 53a-119(5)(D). Under Massachusetts law, extortion includes, among other acts, "malicious[ ] threat[s] to accuse another of a crime or offence … with intent thereby to extort money or any pecuniary advantage[.]" Mass. Gen. Laws ch. 265, § 25. Under New Jersey law, extortion includes, among other conduct, "purposely and unlawfully obtain[ing] property of another" by threatening to "[a]ccuse anyone of an offense or cause charges of an offense to be instituted against any person" or to "cause an official to take or withhold action[.]" N.J. Stat. § 2C:20-5(b), (d).

[4] Although the statutes in Connecticut and New Jersey exempt labor action "for the benefit of the group in whose interest the actor purports to act[,]" those exemptions apply only to strikes, boycotts, and related collective actions, not threats of criminal prosecution and regulatory obstruction.

shown the predicate acts it alleges as support for its RICO claim do indeed constitute extortion under state law.

The issue, then, is whether Care One has made the second necessary showing: that the Unions' conduct is "capable of being generically classified as extortionate." *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003). More precisely, the question is whether the Unions' conduct fits the generic definition of "extortion … chargeable under State law[,]" which is the phrase that appears in RICO. 18 U.S.C. § 1961(1)(A). While at first glance it may seem paradoxical, the question of what constitutes generic extortion under state law is not, in this context, a matter of state law. It is, instead, a matter of federal law under the RICO statute. *See, e.g.*, *United States v. Forsythe*, 560 F.2d 1127, 1135 (3d Cir. 1977) ("State law offenses are not the gravamen of RICO offenses. … To interpret state law offenses to have more than a definitional purpose would be contrary to the legislative intent of Congress and existing state law."). The Majority equates the generic definition thus developed with the

Conn. Gen. Stat. § 53a-119(5)(F); N.J. Stat. § 2C:20-5(e); *see also United States v. Kirsch*, 903 F.3d 213, 224 (2d Cir. 2018) (reading identical labor exemption to apply only to specific labor action discussed in same subsection, not other enumerated acts of extortion in other subsections). The Model Penal Code appears to operate in the same way. Model Penal Code § 223.4 cmt. (2)(i) (Am. Law Inst. 1980) ("Paragraph (5) reaches the threat of collective unofficial sanctions where, for example, an official of a trade association or union is lining his own pocket by employing the coercive power that he is supposed to wield on behalf of his organization.").

definition of extortion found in the Hobbs Act, 18 U.S.C. § 1951(b)(2), and so it trains its attention exclusively on that. (Maj. Op. at 11-13.) But granting the Majority is correct that the Hobbs Act's definition of extortion closely tracks the Supreme Court's formulation of generic extortion in RICO,[5] there is still good reason to understand the two definitions differently.

As the Majority points out (Maj. Op. at 13-14), the Supreme Court gave a narrow interpretation to the meaning of extortion under the Hobbs Act in *United States v. Enmons*, 410 U.S. 396 (1973). The Court there focused on the particular wording of the Hobbs Act and held that the word "'wrongful' … limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property"; otherwise, the term "wrongful" would be redundant since resort to violence is wrongful in itself. *Id.* at 399-400; *see* 18 U.S.C. § 1951(b)(2). The Court also relied heavily on legislative history, which the Court read as revealing a congressional intent to steer the statute's sanctions away from legitimate labor activity. *See Enmons*, 410 U.S. at 401-08.

---

[5] *Compare* 18 U.S.C. § 1951(b)(2) ("obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right"), *with Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003) ("obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats"). *See also United Bhd. of Carpenters v. Bldg. & Const. Trades Dep't*, 770 F.3d 834, 843-44 (9th Cir. 2014) (interpreting terms similarly).

4

The wording chosen by states to outlaw extortion does not necessarily track the wording of the Hobbs Act, and the linguistic parsing in *Enmons* is thus not obviously applicable.[6] Nor is there any legislative history behind state laws that would – as was true with the Hobbs Act – narrow the meaning of "extortion … chargeable under State law" as a RICO predicate. 18 U.S.C. § 1961(1)(A). And no authority has been offered to suggest that, outside of the Hobbs Act as narrowly interpreted by *Enmons*, laws against extortion have ever been generally understood to be inapplicable to labor unions. *Cf.* Alice Kramer Griep, Comment, *A Study of Statutory Blackmail and Extortion in the Several States*, 44 Mich. L. Rev. 461 (1945) (surveying state extortion statutes and the history of statutory expansion beyond the common law crime of unlawful takings by public officials, without any mention of labor

---

[6] My colleagues in the Majority fault me for not giving a case citation for this proposition. (Maj. Op. at 12 n.43.) I don't believe, however, that a case is needed to demonstrate that state laws define as extortion precisely the things the Majority excuses here, *see supra* note 3, or that the Supreme Court's effort to excise "wrongful" as redundant in the Hobbs Act is peculiar to that statute and the labor-violence context in which the *Enmons* decision arose.

unions);[7] 3 Wayne R. LaFave, Substantive Criminal Law § 20.4(a) (3d ed. 2018) (same).[8]

---

[7] According to the Majority, "[e]ven a cursory look at this article reveals that it does not actually support the stated assertion" that there is a lack of authority, outside of *Enmons*'s interpretation of the Hobbs Act, supporting a labor exemption to extortion laws. (Maj. Op. at 12 n.43.) I will let readers decide whether the article notes special treatment for labor unions – or mentions labor unions at all. (Spoiler alert: it does not.) At any rate, the point I make is straightforward and should not be controversial: apart from and prior to *Enmons*'s interpretation of the Hobbs Act, no one ever thought that labor unions got an exemption from laws against extortion that apply to everyone else. A law review article published before *Enmons* is perfectly capable of supporting that proposition, and I have found no authorities between the time of that article's publication and the publication of *Enmons* suggesting the rise of a labor-union distinction in federal or state laws forbidding extortion. That the article declines to address certain types of threats traditionally considered to be outside of extortion law – "threats which are punishable even though no property is demanded" (Maj. Op. at 13 n.43 (citing Alice Kramer Griep, Comment, *A Study of Statutory Blackmail and Extortion in the Several States*, 44 Mich. L. Rev. 461, 462 (1945))) – says nothing about a labor exemption from extortion laws.

[8] As more fully discussed below, even when interpreting the Hobbs Act, we have not understood *Enmons* as giving a pass to unions for every kind of extortionate behavior. Rather, we have joined other courts of appeals in observing that *Enmons* pertains to the use of force during labor disputes. *See United States v. Agnes*, 753 F.2d 293, 298 (3d Cir. 1985)

6

If the "generic" brand of "extortion … chargeable under State law" as a RICO predicate is in fact something different than Hobbs Act extortion, then any discussion here of the Hobbs Act's definition of "extortion" is perhaps academic. But even if, as the Majority assumes, the meaning of "extortion" is identical in both contexts, I still do not agree with my colleagues that the claim-of-right defense under the Hobbs Act extends to the alleged conduct of the Unions, for the reasons I turn to next.

---

(interpreting *Enmons* to hold that "Congress expressly declared its intent to exclude labor violence from coverage of the Hobbs Act"), *abrogated on other grounds by Smith v. Borough of Wilkinsburg*, 147 F.3d 272 (3d Cir. 1998); *see also, e.g.*, *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1131 (9th Cir. 2014) (reviewing case law reading "*Enmons* as holding only that the use of violence to secure legitimate collective bargaining objectives is beyond the reach of the Hobbs Act"); *United States v. Robilotto*, 828 F.2d 940, 945 (2d Cir. 1987) ("The Court held that, in a labor context, the Hobbs Act 'does not apply to the use of force to achieve legitimate labor ends.'" (quoting *United States v. Enmons*, 410 U.S. 396, 401 (1973))); *United States v. Castor*, 937 F.2d 293, 299 (7th Cir. 1991) ("Whatever the contours of [the claim-of-right] defense may be, they do not reach extortions based on threats of physical violence outside the labor context."); *United States v. Debs*, 949 F.2d 199, 201 (6th Cir. 1991) ("*Enmons* has not been extended beyond its own facts.").

## II.     The claim-of-right defense does not protect every means of economic pressure.

The claim-of-right defense to a charge of extortion has two distinct requirements: the defendant must have the right to pursue a particular objective and the right to use the particular means it has chosen for that pursuit.  For the defense to be operative, both requirements must be met.  *See United States v. Cerilli*, 603 F.2d 415, 419-20 (3d Cir. 1979) ("The receipt of money … is generally not inherently wrongful.  The wrong under the Hobbs Act is the manner in which it is obtained."); *United States v. Clemente*, 640 F.2d 1069, 1077 (2d Cir. 1981) ("In *Cerilli*, … the Third Circuit determined that the 'manner' in which the property is obtained has a bearing on whether the objective, 'obtaining the property from another,' is legitimate.  In other words, the Third Circuit declined to evaluate the 'objective' of the defendants in a vacuum, independent of the conduct involved.").  That two-part rule extends even to the pursuit of what is lawfully one's own, so, for example, extortion includes threats of violence in the collection of a debt. *See United States v. Nakaladski*, 481 F.2d 289, 298 (5th Cir. 1973) (upholding jury finding that defendants participated in threats of violence to collect loan payments).  Thus, I disagree with the Majority's conclusion that there is simply no limit to the means that a union can employ to pursue a legitimate objective.  (*See* Maj. Op. at 21 ("[A]s long as unions pursue legitimate labor objectives, their coercive tactics are simply not subject to liability under the Hobbs Act.").)  While my colleagues assert that "[l]abor is simply different" from every other participant in our society (Maj. Op. at 21), it is not so different that, when it comes to the Hobbs Act, all criminality is excused.

My colleagues believe that their anything-goes-for-unions variation on the claim-of-right defense is supported by the Supreme Court's decision in *Enmons*, 410 U.S. 396, and by our decision in *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998). (Maj. Op. at 13-16.) But *Brokerage Concepts* does not expand on the narrow and specific holding in *Enmons* that I have already described, *see supra* note 8 and related text, and it certainly does not "rel[y] on *Enmons*'s reasoning to cross-apply the claim-of-right defense" (Maj. Op. at 17 n.61). On the contrary, we expressly noted in *Brokerage Concepts* that the facts we faced there were not like those in *Enmons*. *Brokerage Concepts*, 140 F.3d at 523. The difference was that *Brokerage Concepts* "solely involve[d] the accusation of the wrongful use of the fear of economic loss[,]" rather than the fear of labor violence. *Id.* And we went on to consider what kinds of economic threats could be "wrongful[,]" without any regard to whether or not the threats arose in the labor context. *Id.* at 523-24. Nothing in *Brokerage Concepts* or any other case cited by the Majority creates a special immunity for labor unions to extort business concessions through economic fear.

And for good reason. The holding in *Enmons* was pinned to a particular reading of the Hobbs Act that, again, focused on the specific wording of the Act and the idea that violence is inherently "wrongful." *Id.* at 522. That is, the Court in *Enmons* made clear that "it would be redundant to speak of 'wrongful violence' or 'wrongful force' since … any violence or force to obtain property is 'wrongful.'" 410 U.S. at 399-400. In *Brokerage Concepts*, however, we observed that "the use of economic fear in business negotiations … is *not* 'inherently' wrongful." 140 F.3d at 523 (emphasis added) (citing *United States v. Sturm*, 870 F.2d 769, 773 (1st Cir.

9

1989)).  Accordingly, the word "wrongful" is not redundant in the Hobbs Act when modifying a means of obtaining property through economic fear, rather than through violence and force. *Id.* at 522-23; *Sturm*, 870 F.2d at 772-73.  And because the word "wrongful" is not redundant in that context, there remains "the possibility that the use of wrongful economic threats to obtain property to which the defendant is legally entitled may [indeed] be prosecutable as extortion under the Hobbs Act." *Sturm*, 870 F.2d at 773; *Brokerage Concepts*, 140 F.3d at 523-24.[9]

I take our observation in *Brokerage Concepts* that economic fear differs fundamentally from force to reflect an understanding that the holding in *Enmons* – which is limited to the use of "*force* or *violence* to obtain property [in] the labor context[,]" *Brokerage Concepts*, 140 F.3d at 523 – does not

---

[9] Again, *Brokerage Concepts* did not rely on *Enmons*'s reasoning – which was supported by a unique textual analysis and a specific legislative history – and it also did not, as the Majority implies (Maj. Op. at 17 n.61), abrogate cases discussing how *Enmons* is limited to "labor violence[.]" *Agnes*, 753 F.2d at 298; *Cerilli*, 603 F.2d at 420.  Indeed, more recent cases continue to observe the limited applicability of *Enmons*.  *See United States v. White*, 810 F.3d 212, 224 (4th Cir. 2016) ("[O]utside the context of labor relations, the 'claim of right' defense is inapplicable in Hobbs Act cases involving the use or threatened use of violence." (footnote omitted)); *United States v. Daane*, 475 F.3d 1114, 1119 (9th Cir. 2007) (following Ninth Circuit precedent reading *Enmons* as applying only to the use of violence to secure legitimate collective bargaining objectives).

10

give unions a free pass on all manner of extortion.[10]  Although the Majority may find that conclusion "bizarre" (Maj. Op. at 16), it is justifiable and is, in fact, justified by our own case law.  *See United States v. Agnes*, 753 F.2d 293, 298 (3d Cir. 1985) (interpreting *Enmons* to hold that "Congress expressly declared its intent to exclude labor *violence* from coverage of the Hobbs Act" (emphasis added)), *abrogated on other grounds by Smith v. Borough of Wilkinsburg*, 147 F.3d 272 (3d Cir. 1998).[11]  And we are not alone.  *See United States v. Debs*,

---

[10] In arguing from *Enmons* and our cases interpreting it, I make no distinction, as the Majority thinks I do (Maj. Op. at 15 & n.54, 17, 19), between conduct during strikes and conduct during other labor negotiation activities.  My colleagues also say, at one point, that I "manifest[ ] an unwillingness to concede the reality of labor strife and the pressures surrounding it" (Maj. Op. at 16), and, at another point, that I am confused about "whether *Enmons* applies to non-violent labor actions." (Maj. Op. at 20.)  I can only respond that I certainly do recognize the reality that there is labor strife and that there are real and serious pressures surrounding it, but I do not read the case law as giving one side free reign to abuse the other. (Recall that we are bound at this juncture in the case to take the evidence in the light most favorable to Care One.)  Nor am I confused about *Enmons*.  I simply disagree with my colleagues' assertion that "[t]he caselaw cannot fairly be read to foreclose the application of *Enmons* to non-violent [labor] actions[.]" (Maj. Op. at 20.)

[11] The Majority, meanwhile, must rely exclusively on other courts of appeals to support its position "that *Enmons*'s

11

949 F.2d 199, 201 (6th Cir. 1991) (declining to "hold that because some illegality in union activity is justifiable every illegality, including extortion, must also be within the orbit of *Enmons*[,]" which "would immunize union members from sanction so long as their otherwise illegal action is committed in the context of labor activity"); 86 C.J.S. *Threats* § 33 (2017) ("[T]he Act's exception for the use of force to achieve legitimate labor ends does not apply to immunize union members from sanction for all labor-related illegal actions."). And limiting *Enmons* to the labor-violence context does not, as the Majority implies, create any perverse incentives for unions to resort to "more militant tactics" (Maj. Op. at 16), because there are other legal limits on violent conduct.[12]  *See United States v. Mulder*, 273 F.3d 91, 104 (2d Cir. 2001) (approving jury instruction on labor exception to Hobbs Act, where the instruction explained that the "exception does not imply that violence is lawful or proper in general[; o]bviously, it is

---

holding is generally applicable to labor-management conflicts[,]" not just labor violence.  (Maj. Op. at 16-18.)

[12] *E.g.*, Conn. Gen. Stat. § 53a-60(a) (criminalizing as second degree assault when someone, "[w]ith intent to cause serious physical injury to another person, … causes such injury to such person or to a third person"); *Commonwealth v. Dorvil*, 32 N.E.3d 861, 866 (Mass. 2015) (defining "assault and battery" as "the intentional and unjustified use of force upon the person of another, however slight"); N.J. Stat. § 2C:12-1(1) (criminalizing as assault when someone "[a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury to another").

12

not").[13]　Unlike my colleagues, I'm confident that union leaders are smart enough to avoid concluding, "If we can't extort management with wrongful threats of criminal prosecution and regulatory holdups, let's just shoot them."

Accordingly, I would not ignore, as the Majority does, our cases addressing the extortionate use of economic fear, simply because the alleged extortionist is a labor union.　In those cases, we considered the means pursued when we were judging entitlement to the claim-of-right defense.　In *Brokerage Concepts*, for example, we asked "whether the defendants' use of economic fear in the context of hard business bargaining constitutes wrongful conduct amounting to extortion for civil RICO purposes[.]"　140 F.3d at 501.　The defendant in that case conditioned its approval of a pharmacy's admission into the defendant's health insurance network on the pharmacy's discontinuation of its contract with a consultant, the plaintiff.　*Id.*　The pharmacy acceded, so the consultant

---

[13] The Majority correctly notes that in *United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001), certain jury instructions – including those proposed by the parties and those ultimately used by the court – were "correct[,]" but the Majority then focuses only on the facts of that case, in which the union defendants threatened both slowdowns and violence to secure "no-show jobs[.]"　*Id.* at 98-99.　(Maj. Op. at 15 n.55.)　The Majority omits the court's discussion of what made certain instructions "correct."　Among the "legally correct" proposed instructions was one that "may have helped the jury better understand the counter-intuitive proposition that the use of *violence in a labor dispute* does not violate the Hobbs Act."　*Mulder*, 273 F.3d at 105 (emphasis added).

13

sued. "[W]e conclude[d] that [the plaintiff's] extortion claim can only survive if [the pharmacy] had a right to pursue its business interests free of the fear that it would be excluded from [the defendant's] provider network." *Id.* at 503. We thus explicitly undertook to consider the lawfulness of the defendant insurance company's use of economic leverage, the refusal to deal, not just its objective of ending the contract. *See also United States v. Tobin*, 155 F.3d 636, 640-41 (3d Cir. 1998) (addressing threats of unrelated lawsuits and bad publicity from an individual angry at not being hired); *Cerilli*, 603 F.2d at 418 (addressing the government's leasing of equipment conditioned on lessors' political payments).

I do, of course, agree that the Unions here had every right to pursue favorable terms in a collective bargaining agreement. That is a perfectly lawful objective, and they were entitled to pursue it aggressively, including with a strike, which naturally threatens economic loss to the business owner. By definition, as my colleagues note, "[t]he underlying purpose of a strike … is … to exert such economic loss (or threat of loss) upon [a] business that the employer agrees to labor's demands." (Maj. Op. at 21.) But that does not mean that everything that threatens economic loss is merely hard bargaining. From the proposition that some means of economic pressure are proper, it does not follow that all means of economic pressure are proper. It is likewise fallacious to assert, as the Majority does, that unions are categorically shielded from Hobbs Act liability for every kind of economic coercion they may employ. (Maj. Op. at 18.)

Imagine, for instance, that in pursuit of employment, an individual threatens an employer with financial ruin via a never-ending campaign of sham civil litigation, unless she is

14

hired. The Majority seems to agree that the threat would go beyond mere hard bargaining protected by a claim-of-right defense. (Maj. Op. at 20 n.69.) Indeed, we dealt with that precise scenario in *United States v. Tobin*, 155 F.3d 636 (3d Cir. 1998), denying a claim-of-right defense when the defendant, who was denied employment, "threatened unrelated lawsuits alleging sexual harassment" instead of "legal action to enforce the oral contract that she claimed existed." *Id.* at 640. Now imagine the same scenario, except the threat comes from a union official on behalf of the individual seeking employment and is backed by the union's vastly larger litigation budget. Suddenly, according to the Majority, the threats are shielded from Hobbs Act liability. (Maj. Op. at 18.) That cannot be.

The question, then, is whether the Unions used lawful means to obtain their legitimate end.[14] A sound test for

_____

[14] I am assuming here that the Unions' objective really was legitimate. There is evidence in this record from which one could conclude that even that is not so. For the Unions, achieving a collective bargaining agreement may have taken second place to using Care One as an example of what will happen to a business if it has the temerity to push back on labor demands. Since the Unions arguably selected Care One as a target for union activity because they thought Care One would be susceptible to threats of criminal prosecution (*see* J.A. at 2347 (identifying Care One as among "potential campaign targets")), it is not farfetched to believe that reaching an agreement was not the Unions' primary objective; publicly pounding a business and its owner was. That is certainly what Care One believes. (*See* Reply Br. at 11 (quoting testimony that the Unions' objective was to "bring [Care One] to [its]

assessing the lawfulness of the means, and thus the availability of a claim-of-right defense, is to ask whether there is a reasonably close relationship – a nexus – between a proper claim and the threatened harm. Without such a nexus, the lawfulness of the means is suspect. *See United States v. Jackson*, 180 F.3d 55, 70 (2d Cir.) ("We do … view as inherently wrongful the type of threat to reputation that has no nexus to a claim of right."), *rev'd on reh'g on other grounds*, 196 F.3d 383 (2d Cir. 1999); *United States v. Villalobos*, 748 F.3d 953, 959 (9th Cir. 2014) (Watford, J., concurring in the judgment) (concluding that the claim-of-right defense was inapplicable because "no nexus existed between the threat [of testifying in a criminal prosecution] and the property demanded"). Requiring a nexus eliminates a safe haven for threats of a collateral nature. People generally recognize that individuals have a right to withhold their labor while negotiating about the value of it. Threatening to fabricate a criminal charge against a negotiating counterparty is, by contrast, not something reasonably related to a labor negotiation and would not likely be seen as such by anyone with a sense of simple justice or a passing familiarity with state extortion laws.

Applying the reasonable-nexus test here, I would hold that Care One has presented serious evidence that the Unions' threats of criminal prosecution and regulatory obstruction lacked any justifiable nexus to their ongoing labor

---

knees" (second alteration in original)).) But, for the sake of argument, I take it that a legitimate objective was what the Unions were driving at.

16

negotiations.[15]  Taking the view most favorable to Care One, as we must,[16] a jury could rightly say that the threats exceed what we've called "hard bargaining."  *Brokerage Concepts*, 140 F.3d at 522.  As already noted, we addressed in *Brokerage Concepts* a threatened refusal to deal, where two private parties were engaged in discussion over a mutually beneficial exchange.  *Id.* at 503.  That is a world apart from threatening to engage the power of the state to destroy a business that won't capitulate to a negotiating partner's demands.  Federal courts have repeatedly recognized the potentially extortionate nature of holding up regulatory approvals or invoking criminal

---

[15] If the Unions had threatened regulatory or criminal pressure that was directly related to their working conditions or CBA, for example threatening to file a legitimate complaint with the National Labor Relations Board, then summary judgment might well have been appropriate.  Here, however, the nexus between threat and objective appears untenable.  As discussed herein, *infra* Section III, Care One presents evidence that the Unions threatened criminal prosecution and regulatory obstruction in areas that were unrelated to their working conditions, including Care One's Medicare billing practices and infrastructure investment.

[16] In evaluating the Unions' motion for summary judgment, we must determine whether there are any genuine disputes of material fact, and if not, we view the evidence in the light most favorable to Care One and decide whether the Unions are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

investigations,[17] and well-established law elsewhere confirms that threats to report a crime[18] or to manipulate regulatory

---

[17] *See, e.g.*, *United States v. Williams*, 952 F.2d 1504, 1514 (6th Cir. 1991) ("In this case, defendant's exploitation of the victims' fears was based on the implied threat that, unless payments were forthcoming, rezoning would never take place, and the victims would suffer a devastating economic loss."); *United States v. Zappola*, 677 F.2d 264, 269 (2d Cir. 1982) ("Congress meant to punish as extortion any effort to obtain property by inherently wrongful means, such as force or threats of force or criminal prosecution, regardless of the defendant's claim of right to the property."); *United States v. Pranno*, 385 F.2d 387, 389 (7th Cir. 1967) (upholding Hobbs Act extortion conviction for conduct "threatening … that [a] building permit would not be issued"); *United States v. Edwards*, 324 F. Supp. 2d 10, 13 (D.D.C. 2004) (in denying motion for acquittal, noting that indictment charged the defendant for extortion because he, among other things, "caus[ed the victim] to encounter oversight and regulatory problems").

[18] *See, e.g.*, Conn. Gen. Stat. § 53a-119(5) ("A person obtains property by extortion when he compels or induces another person to deliver such property to himself or a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will … accuse some person of a crime or cause criminal charges to be instituted against him[.]"); *Flatley v. Mauro*, 139 P.3d 2, 22-23 (Cal. 2006) (concluding that certain threats to accuse the plaintiff of committing crimes "constitute criminal extortion as a matter of law"); *People v. Watson*, 11 N.W.2d 926, 928 (Mich. 1943) (interpreting extortion statute as "cover[ing] a threat merely to publicly accuse another of a crime"); *O'Neil v. State*, 296 N.W.

authorities[19] can constitute extortion.  Threats like that fit the definition of extortion because victims have "a legal entitlement to be … free of the fear" so engendered.  *Id.*

Rather than categorically exempting such behavior from liability, we ought to be directing the District Court to send to a jury the question of whether the Unions here wrongfully exploited threats of regulatory obstruction and criminal prosecution and so, in a manner that constitutes extortion, brought to bear the power of government to grind down a business in the midst of labor negotiations.

### III. The Unions threatened to continue leveraging criminal and regulatory pressure points unless their economic demands were met.

The District Court concluded that Care One presented no evidence of threats, and the Majority does not take issue with that conclusion.  I would hold that the District Court erred

---

96, 100 (Wis. 1941) (rejecting proposition that "maliciously threaten[ing] to accuse the wrongdoer of the crime with the intent thereby to extort money from him" was lawful); *McKenzie v. State*, 204 N.W. 60, 63 (Neb. 1925) (discussing a statute "mak[ing] it unlawful to maliciously threaten to accuse another of a crime … done with intent to extort from or to compel action against the will of the person so threatened").

[19] *See* N.J. Stat. § 2C:20-5(d) ("A person extorts if he purposely threatens to … cause an official to take or withhold action[.]"); Model Penal Code § 223.4 (requiring the perpetrator to obtain property by "threatening" to, among other things, "cause an official to take or withhold action").

because Care One certainly did present evidence from which a jury could reasonably conclude that the Unions threatened to continue their campaign of impugning Care One to law enforcement and regulatory authorities, unless Care One met the Unions' collective bargaining demands.

First, the record supports an inference that the Unions threatened a criminal investigation. That may not be the only possible conclusion on this record, but it is a rational one and would be supported by clear proof.[20] In 2009, the Service Employees International Union "assess[ed] [Care One facilities] as potential campaign targets" to extract labor concessions because data mining revealed the possibility of Medicare fraud. (Joint Appendix ("J.A.") at 2347.) In other

---

[20] In the Norris-LaGuardia Act, Congress provided special protections to unions and their members when it comes to litigation involving labor disputes, including the protection of a heightened burden of proof. *United Bhd. of Carpenters v. United States*, 330 U.S. 395, 401-03 (1947). Section 6 of that Act provides:

> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

29 U.S.C. § 106.

words, there is reason to believe that, since before the start of contract negotiations, the Unions had planned on using allegations of Medicare fraud for leverage against Care One. And there is substantial evidence that Care One was both meant to understand and in fact did understand that such allegations were being used as negotiating leverage. (*See* J.A. at 3697-98 (Union attorney confirming that request to investigate Medicare fraud "was one of the leverage points"), 4400 (Care One representative testifying that after seeing letter alleging questionable Medicare billing practices, he understood the "message [to be] that, this is what's coming unless you agree to … their demands").) Care One representatives were told that they would be driven out of business in Connecticut unless collective bargaining demands were met.[21] A Union representative hedged a bit but affirmed he had essentially said just that. (*See* J.A. at 4892 ("I may have" said "something along [the] lines" of "HealthBridge needed to agree to [the collective bargaining] agreement and increase payments into

---

[21] (*See* J.A. at 4374 ("[I]f we didn't do what he wanted then he is going to look to get rid of our businesses" because "we understood the relationship with the [Union] and the politicians in Connecticut and we understood that the [Union] had the ability to have the politicians create issues for us."), 4178 ("I don't remember exactly how he phrased it, but the gist of what he said was we need these contracts, if you can't do it, we will help you find somebody who can buy these places that can do it, and you just can get out of Connecticut."), 4373 ("I remember that [a Union representative] essentially said that if, if we didn't agree to the pattern contract that, you know, we'd have to leave the State of Connecticut or he would drive us out of the State of Connecticut or something like that.").)

21

the pension plan, otherwise it would need to leave the state of Connecticut[.]").)  Eventually, the Unions solicited a letter from United States Senator Richard Blumenthal to the Department of Justice suggesting that it pursue a criminal investigation against Care One.  The Unions then ensured that a copy of that letter was delivered to Care One.

There is also ample evidence that the Unions' regulatory petitioning was undertaken in service of their labor negotiations.  After Care One filed with the Massachusetts Public Health Council a Determination of Need Application, seeking to spend more than four million dollars on a "[s]ubstantial renovation of [a] skilled nursing facility" (J.A. at 2552), an affiliate of the Unions filed an opposition and requested a public hearing.  At that hearing (nearly a year later), two Union members opposed the renovations, "alleg[ing] that they had been wrongfully dismissed from their longstanding jobs because of their support for the formation of a union at the nursing home." (J.A. at 2557.)  The opposition was obviously unrelated to the nature of the hearing, and the regulator concluded as much. (*See* J.A. at 2557 ("Staff did not find these comments to be pertinent to … [the government's] regulatory authority in its review of this application.").)  During a deposition, a Union official acknowledged that their opposition "was for an objective other than blocking the repairs[.]" (J.A. at 3382.)

The following year, the Unions similarly opposed an application by Care One to close a facility in Connecticut.  A Union official stated in an internal email that the opposition "really has little to do with the closure issue, we just want to go after the people who are going after us." (J.A. at 2546.)  Care One asserts that the Unions' opposition resulted in a six-

22

month delay of the closure. The entirety of the Unions' pressure campaign should be viewed in the aggregate. *See Tobin*, 155 F.3d at 640-41 (considering defendant's various "actions [that] went far beyond" hard bargaining). From that perspective, a jury could find that the threat of regulatory holdup in the Connecticut proceeding was apparent from the whole of the Unions' behavior during the negotiations. *See Nakaladski*, 481 F.2d at 298 (holding that evidence demonstrating history of extortionate extensions of credit supported the finding that later extensions were also intended to be extortionate).

The District Court adopted too narrow an understanding of what can constitute extortionate behavior, and so has the Majority. There is evidence showing that the Unions threatened Care One with criminal investigation and caused baseless regulatory holdups. In light of that evidence – which, as just described, includes the Senator Blumenthal letter and the Massachusetts and Connecticut regulatory oppositions – I would say there is enough to submit to a jury the question of whether there is clear proof that extortionate threats actually occurred.

## IV.    Whether the Unions authorized or ratified the July 2nd sabotage should be put to a jury.

As the Majority rightly concludes, a jury could infer that Union workers committed acts of sabotage against Care One. (Maj. Op. at 21-22.) Unlike the Majority, however, I think a reasonable and properly instructed jury could also infer from the Unions' prior statements, from the coordinated timing of the sabotage, and from the subsequent obfuscation by the Unions, that they authorized or ratified those acts. In other

23

words, a reasonable jury could find that Care One's evidence meets the "clear proof" evidentiary burden required by Section 6 of the Norris-LaGuardia Act.[22] "Clear proof" is not an unreachable standard. *See, e.g.*, *Yellow Bus Lines, Inc. v. Drivers Local Union 639*, 883 F.2d 132, 136 (D.C. Cir. 1989) (concluding "that a reasonable jury could have found 'clear proof' of union ratification or authorization[,]" which a union can accomplish "without going so far as to openly encourage or embrace the tactics" deployed by members); *see also Fry v. Airline Pilots Ass'n, Int'l*, 88 F.3d 831, 842 (10th Cir. 1996) ("allowing a case-by-case determination based on the unique facts of each case" because "[t]he terms 'participation,' 'authorization,' and 'ratification' are fact based"). It does not mean proof beyond a reasonable doubt. I understand it to be something akin to the familiar standard of "clear and convincing evidence," and there is enough here that a jury should have a chance to consider the evidence.

On July 2, 2012, the night before multiple Union-organized strikes were scheduled to begin, acts of sabotage took place simultaneously at three Care One facilities. There is evidence that, in advance of that sabotage, the Unions engaged in inflammatory rhetoric and encouraged labor organizers to spark "greater and more militant levels of activity." (J.A. at 5849.) The president of one of the Unions told workers that "the law takes too long" and that his Union "could be destroyed by the time the law was able to stop [Care One's] behavior." (Opening Br. at 22 (alteration in original) (quoting Defs. S.J. Reply at 5).) I think a jury could reasonably see those communications and the multiple, simultaneous acts

---

[22] *See supra* note 20.

24

of sabotage that immediately followed as clear proof of the Unions' authorization of the sabotage. *See United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 272 (7th Cir. 2009) ("An employer may meet the clear proof standard" by relying on evidence of union members' unlawful conduct "in combination with evidence of a union's coded communications to its members to engage in an unlawful job action.").

Added to that evidence is the Unions' failure to cooperate with the police investigation of the sabotage. One Union leader wrote in an email that "we have an obligation to our members even when they are totally in the wrong, if that proves to be the case." (J.A. at 5831.) That leader also wrote an email strategizing how to "rebut, or at least confuse, the sabotage claims" during the investigation. (J.A. at 5842.) Thus, a logical inference of ratification under an agency theory is permissible, and the District Court usurped the role of the jury by concluding that Care One had not presented clear proof of that. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1409 (11th Cir.) ("From the Union's failure to act, a reasonable jury could conclude that the Union 'knowingly tolerated' the situation, and thereby ratified it."), *modified on reh'g on other grounds*, 30 F.3d 1347 (11th Cir. 1994). And the evidence of authorization and of ratification is mutually reinforcing, each piece strengthening the inferences to be drawn from the other.

I do not believe, as my colleagues do, that Care One's evidence fails as a matter of law to meet the required evidentiary standard. The Majority's and the Unions' insistence that no fair reading of the evidence could lead a properly instructed jury to conclude that the Unions crossed the line into unlawful behavior has the ring of "nothing to see here; move along." I think the record shows that there is indeed

something to see, and a jury should see it. The Majority's efforts to distinguish the facts in *Fry v. Airline Pilots Association, International*, 88 F.3d 831 (10th Cir. 1996), from the facts here (*see* Maj. Op. at 28), demonstrate precisely why a jury should look at all the evidence. What has been offered as proof of authorization or ratification goes well beyond only the "vague statements" and post-hoc "condemnation of the vandalism" that the Majority addresses. (Maj. Op. at 28.) While the Majority is correct that the Norris-LaGuardia Act reflects Congress's view that "unions require heightened protection" in exercising their right to collectively bargain (Maj. Op. at 23), it is just as true that businesses deserve better protection than none at all, which is what the Majority's interpretation of the standard of proof appears to provide.

In sum, I would vacate and remand to allow a jury to consider whether the Unions threatened a campaign of regulatory opposition and criminal prosecution, a campaign with no proper nexus to their labor negotiations, and whether they authorized or ratified acts of sabotage. A fair-minded and properly instructed jury might well side with the Unions, but it could side with Care One, and Care One should have its day in court.